IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMPLAINT OF:<br>BORGHESE LANE, LLC<br><br>For Exoneration or Limitation of Liability | )<br>)<br>)<br>)   Civil No. 2:18-cv-00533-MJH (Lead Case)<br>)<br>)   Member and Related Cases: Civil Action Nos.<br>)   18-510; 18-178; 18-913; 18-902; 18-1647; and<br>)   18-317 |

## OPINION and ORDER

This action arises out of a January 13, 2018 multiple-barge breakaway originating at Jack's Run Fleet, at approximately Mile 4 on the Ohio River, that continued downriver to the Emsworth Lock and Dam. Presently before the Court are Allegheny County Sanitary Authority's (Alcosan) and Ingram Barge Company LLC (Ingram) and Crounse Corporation's (Crounse) Motions in Limine to limit the proposed expert testimony of David J. Bizzak pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals*. (ECF Nos. 553 and 562). These motions are now ripe for decision.

Upon consideration of Alcosan's and Ingram and Crounse's Motions (ECF Nos. 553 and 562), Allegheny County Sanitary Authority's (Alcosan) Joinder to Ingram and Crounse's Motion (ECF No. 565), United States of America's Joinder (ECF No. 564), Heartland Barge Management, LLC's Joinder (ECF No. 567), American River Transportation Co., LLC's Joinder (ECF No. 570), the respective briefs (ECF Nos. 554, 562-1, 615, 624 and 627), the arguments of counsel, and for the following reasons, Alcosan's and Ingram and Crounse's Motions will be granted.

I.  Background

In the aftermath of the barge breakaway, several barge owners filed lawsuits against Borghese, McKees Rocks Harbor Services, LLC (MRHS), and Industry Terminal & Salvage Company (ITS), seeking recovery for damages resulting from breakaway barges that had been moored at Jacks Run Fleet.

Borghese, Ohio River Salvage, Inc. (ORS), and MRHS have proffered David J. Bizzak, Ph.D., P.E., as an expert in this action "to opine as to whether the actions of Borghese Lane in maintaining the fleet of barges were the cause of the breakaway, as well as to reconstruct the manner in which the breakaway occurred." (ECF No. 553-1).  Based upon the river conditions prior to the incident, Mr. Bizzak analyzed the force exerted on the fleet of barges moored at Jack's Run prior to the breakaway. He then provided an opinion on the cause of the breakaway. *Id*.  A portion Mr. Bizzak's report, relative to the motions at hand, offers the following conclusions:

- Shoaling due to sediment deposits from Jack's Run Creek rendered a portion of the facility unsuitable for mooring loaded barges;

- Due to the shoaling at the facility, Borghese Lane could not practically narrow the fleet of 27 barges;

- The increased load on the fleet as the combined result of rising river level, increased current flow and unanticipated dense ice flow caused the breakaway;

- Conservative analyses suggest the increased loading on the fleet due to increased current flow and ice flow could have been on the order of 6,000 tons; and

- Failure of the anchor D-ring on Cell 8 occurred [sic] to decreased impact strength of the material due to cold ambient temperatures, as well as notches introduced into the D-ring over years of continuous use.

*Id*. at p. 7.

According to Mr. Bizzak's CV, he holds degrees in mechanical engineering, with areas of specialization including product design/manufacturing defects, automotive accident reconstruction, and premises liability matters. (ECF No. 553-3).

In its *Daubert* Motion, Alcosan argues that Mr. Bizzak lacks adequate qualifications as an expert in breakaway incidents. Ingram and Crounse also contend that Mr. Bizzak's is not qualified to render opinions in maritime matters and metallurgy.  Alcosan's motion also argues that Mr. Bizzak does not provide a reliable method for his opinions pertaining to the amount of force exerted on the fleet. At the time of oral argument, Alcosan represented to the Court that it would not be pursuing this second argument.  As such, said argument is considered withdrawn, and analysis herein will only concern whether or not Mr. Bizzak lacks adequate expert qualifications to render opinions on maritime operations, maritime breakaway incidents, and metallurgy.

II.     Relevant Standard

Under Federal Rule of Evidence 702, the District Court is to act as a gatekeeper to, "ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010).  Federal Rule of Evidence 702 provides in part that: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if,

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data; research;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court in *Daubert v. Merrell Dow Phamaceuticals*, 509 U.S. 579 (1993) changed the criteria for the admissibility of expert testimony and charged trial courts to act as "gate-keepers" to ensure that the proffered testimony is both relevant and reliable. *Id*. at 592-93. In *Daubert*, the Supreme Court articulated the following two-prong test for determining the admissibility of expert testimony:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id*. at 593-94. Both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted. *Id*. at 595. The Third Circuit has explained that Rule 702 "embodies a trilogy of restrictions" that expert testimony must meet for admissibility: qualification, reliability and fit. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The Third Circuit has explained:

> Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.

*Id*. at 404. When expert testimony is challenged under *Daubert*, "the proponents of the expert must establish admissibility by a preponderance of the evidence." *Bruno v. Bozzuto's*, Inc., 311 F.R.D. 124, 135 (M.D. Pa. 2015).

III.   Discussion

Alcosan, Ingram, and Crounse argue that Mr. Bizzak must be precluded from offering any opinion testimony on maritime operations, maritime breakaway incidents, and metallurgy because he fails to meet the qualification standards to be certified as an expert on those subjects.

Borghese Lane, LLC ("Borghese"), Ohio River Salvage, Inc., ("ORS") and McKees Rocks Harbor Services, LLC ("MRHS") contends that Dr. Bizzak has sufficient qualifications to provide a foundation for [him] to answer a specific question: what was the cause of the January 13, 2018 barge breakaway.  They further argue that maritime expertise is not necessary to opine as to the forces that acted upon a barge fleet; rather, engineering expertise is undoubtedly required to analyze and evaluate forces.

In response, Alcosan, Ingram, and Crounse argue that Mr. Bizzak does indeed render certain maritime and metallurgical opinions, outside his expertise, including the following opinions:

- Shoaling due to sediment deposits from Jack's Run Creek rendered a portion of the facility unsuitable for mooring loaded barges;

- Due to the shoaling at the facility, Borghese Lane could not practically narrow the fleet of 27 barges;

- The increased load on the fleet as the combined result of rising river level, increased current flow and unanticipated dense ice flow caused the breakaway;

- Conservative analyses suggest the increased loading on the fleet due to increased current flow and ice flow could have been on the order of 6,000 tons; and

- Failure of the anchor D-ring on Cell 8 occurred [sic] to decreased impact strength of the material due to cold ambient temperatures, as well as notches introduced into the D-ring over years of continuous use.

(ECF No. 553-1 at p. 7).  Alcosan, Ingram, and Crounse contend that, opinions about whether shoaling rendered any portion of the Jack's Run Fleeting Facility unsuitable for mooring barges or whether any shoaling prohibited Borghese Lane from narrowing the fleet prior to the breakaway, are maritime opinions and not mechanical engineering opinions.  Further, Ingram

5

and Crounse challenge Dr. Bizzak's opinions in the area of metallurgy.  As such, they maintain Dr. Bizzak is not qualified to render said maritime and metallurgical opinions.

An expert witness must "possess specialized expertise," with "a broad range of knowledge, skills, and training qualify[ing] an expert." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  A witness may be qualified to serve as an expert in one discipline, but not in another. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). At a minimum, a proffered expert … must possess skill or knowledge greater than the average layman…" *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998).  Experts who lack formal education or training in a particular area must rely upon practical experience to demonstrate that they possess "the minimum qualifications necessary to testify as an expert." *Elcock v Kmart Corp.*, 233 F.3d 734, 743 (3d Cir. 2000).

Here, Mr. Bizzak's opinions include analyses and opinions regarding ice formation, river conditions, metallurgy, and fleet management.  Mr. Bizzak admits he is not an expert in structural engineering, civil engineering, maritime construction, meteorology, metallurgry, or the manner in which barges should be fleeted, managed, configured, or secured to mooring cells. Mr. Bizzak testified that, prior to his retention in this case, he has never: (1) been involved in any evaluation, inspection, or investigation involving a barge fleet or a breakaway maritime incident; or (2) calculated the force associated with ice flow; or (3) been involved in a case involving failures of mooring cells or involving water current or ice flow issues.  Based upon a review of the foregoing, the Court cannot qualify Mr. Bizzak in the area of maritime or metallurgical opinions.  Neither his CV nor his testimony demonstrate a sufficient and specific mariner or metallurgical background to qualify him to render his proffered opinions that are clearly maritime and metallurgical in nature.

Accordingly, Alcosan's and Ingram and Crounse's Motions to Exclude David J. Bizzak's maritime and metallurgical opinions will be granted.

ORDER

Following consideration of Alcosan's and Ingram and Crounse's Motions (ECF Nos. 553 and 562), Allegheny County Sanitary Authority's (Alcosan) Joinder in Ingram and Crouse's Motion (ECF No. 565), United States of America's Joinder (ECF No. 564), Heartland Barge Management, LLC's Joinder (ECF No. 567), American River Transportation Co., LLC's Joinder (ECF No. 570), the respective briefs (ECF Nos. 554, 562-1, 615, 624 and 627), the arguments of counsel, and for the foregoing reasons, Alcosan's and Ingram and Crounse's Motions are granted. The following opinions will be stricken and Mr. Bizzak will be precluded from testifying to the same:

- Shoaling due to sediment deposits from Jack's Run Creek rendered a portion of the facility unsuitable for mooring loaded barges;

- Due to the shoaling at the facility, Borghese Lane could not practically narrow the fleet of 27 barges;

- The increased load on the fleet as the combined result of rising river level, increased current flow and unanticipated dense ice flow caused the breakaway;

- Conservative analyses suggest the increased loading on the fleet due to increased current flow and ice flow could have been on the order of 6,000 tons; and

- Failure of the anchor D-ring on Cell 8 occurred [sic] to decreased impact strength of the material due to cold ambient temperatures, as well as notches introduced into the D-ring over years of continuous use.

Dated: March 2, 2023

Marilyn J. Horan
United States District Judge