IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMPLAINT OF:<br>BORGHESE LANE, LLC<br><br>For Exoneration or Limitation of Liability | )<br>)<br>)<br>)   Civil No. 2:18-cv-00533-MJH (Lead Case)<br>)<br>)   Member and Related Cases: Civil Action Nos.<br>)   18-510; 18-178; 18-913; 18-902; 18-1647; and<br>)   18-317 |

**OPINION and ORDER**

This action arises out of a January 13, 2018 multiple-barge breakaway, that originated at Jack's Run Fleet at approximately Mile 4 on the Ohio River and continued downriver to the Emsworth Lock and Dam. Presently before the Court is Borghese, ORS, and MRHS's Motion in Limine to exclude opinions of David J. Martyn, citing to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals*. (ECF No. 574). The matter is now ripe for decision.

Upon consideration of Borghese, ORS, and MRHS's Motion (ECF No. 574), the respective briefs (ECF Nos. 583, 606, and 632), the arguments of counsel, and for the following reasons, Borghese, ORS, and MRHS's Motion will be denied.

I.   Background

In the aftermath of the barge breakaway, several barge owners filed lawsuits against Borghese, McKees Rocks Harbor Services, LLC (MRHS), and Industry Terminal & Salvage Company (ITS), seeking recovery for damages resulting from breakaway barges that had been moored at Jack's Run Fleet.

ITS and ALCOSAN retained David J. Martyn to evaluate the safety of the Jack's Run fleeting area mooring configuration at the time of the January 13, 2018 breakaway. In his

report, Mr. Martyn concludes the following "factors, together, [were] the most likely cause[s] of the mooring failure that initiated the breakaway":

1. MRHS/Borghese failed to follow the ITS Fleeting Procedure Guide for rising river, high water, and ice conditions

2. The barge arrangement, with the addition of 11 more loaded barges (from 16 to 27 total) contributed to increased hydrodynamic forces and moments that overwhelmed the mooring system.

3. Failing to narrow the fleet multiplied the hydrodynamic forces, moments, and resultant tensile and shear stresses in the barge fleet attachments to the mooring cells.

4. The irregular shape of the barge fleet further increased the turning movement and resultant stresses on the fleet attachments to the mooring cells.

5. The "duck pond" within the barge fleet created a weak spot that contributed to the rapid break-up of the fleet after it initially came loose from the mooring cells.

(ECF No. 574-4).

In their *Daubert* motion, Borghese, ORS, and MRHS argue that 1) Mr. Martyn is unqualified to provide expert testimony on fleet management issues; 2) Mr. Martyn's opinions are devoid of methodology and ignore alternative causes; 3) Mr. Martyn's opinions are unreliable; and 4) Mr. Martyn's conclusions regarding the "duck pond" are not relevant and should be excluded.

II.     Relevant Standard

Under Federal Rule of Evidence 702, the District Court is to act as a gatekeeper to, "ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010). Federal Rule of Evidence 702 provides in part that: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if,

>  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>  (b) the testimony is based on sufficient facts or data; research;
>
>  (c) the testimony is the product of reliable principles and methods; and
>
>  (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court in *Daubert v. Merrell Dow Phamaceuticals*, 509 U.S. 579 (1993) changed the criteria for the admissibility of expert testimony and charged trial courts to act as "gate-keepers" to ensure that the proffered testimony is both relevant and reliable. *Id*. at 592-93. In *Daubert*, the Supreme Court articulated the following two-prong test for determining the admissibility of expert testimony:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id*. at 593-94. Both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted. *Id*. at 595. The Third Circuit has explained that Rule 702 "embodies a trilogy of restrictions" that expert testimony must meet for admissibility: qualification, reliability and fit. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The Third Circuit has explained:

> Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.

*Id*. at 404. When expert testimony is challenged under *Daubert*, "the proponents of the expert must establish admissibility by a preponderance of the evidence." *Bruno v. Bozzuto's*, Inc., 311 F.R.D. 124, 135 (M.D. Pa. 2015).

    III.    Discussion

    A.  Qualifications

Borghese, ORS, and MRHS maintain that Mr. Martyn is unqualified to provide expert testimony on fleet management issues because he exceeds the scope of his qualifications when he opined on Borghese's fleet management decisions. In particular, they argue that Mr. Martyn's testimony, regarding, "planning considerations" on how the barges should have been moved, where the barges should have been moved, or how wide the fleet should have been, were "outside [his] scope of work." (ECF No. 574-5 at p. 82:18-84:7).

In response, Alcosan[1] contends that Mr. Martyn's qualifications and experience, as an engineer and a member of the Coast Guard, are sufficient under Fed. R. Evid. 702. In particular, Alcosan asserts that, during Mr. Martyn's service, he led and managed: (1) federal investigations of maritime accidents; (2) investigations of lock/dam and bridge allisions; and (3) regulatory compliance and enforcement of waterfront facilities. (ECF No. 574-6). Alscosan also maintains that Mr. Martyn's principal function was to maintain safe navigation of federal inland waterways. *Id*. Accordingly, Alcosan argues that Martyn's lengthy career in the Coast Guard "inherently required him to know and appreciate concepts related to force and leverage on watercraft," such that Martyn's opinions satisfy the requirements of Rule 702.

In their Reply, Borghese, ORS, and MRHS contend that Alcosan does not explain how Martyn's experience as a Coast Guard inspector, investigator, and compliance officer provides

---

[1] ITS did not separately respond to the within motion.

any basis for qualifications to opine on unique logistical issues and decision-making considerations unique to commercial barge fleeting operations.  Further, they maintain Martyn's Curriculum Vitae is devoid of any experience relevant to commercial barge fleeting operations, including decisions regarding when, where, how, and through what means barges should or should not be moved from a fleet.

An expert witness must "possess specialized expertise," with "a broad range of knowledge, skills, and training qualify[ing] an expert." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). At a minimum, a proffered expert ... must possess skill or knowledge greater than the average layman ..." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998). Experts who lack formal education or training in a particular area must rely upon practical experience to demonstrate that they possess "the minimum qualifications necessary to testify as an expert." *Elcock v. Kmart Corp.*, 233 F.3d 734, 743 (3d Cir. 2000).

Here, after a careful review of Mr. Martyn's CV and testimony relative to experience and education, Mr. Martyn possesses sufficient qualifications to opine on fleeting procedures and physical forces on inland waterway vessels.  Despite Borghese, ORS, and MRHS's contention, Mr. Martyn possesses familiarity with commercial vessels including barges and inland towing vessels.  (ECF No. 574-4 at pp. 22-23).   Further, Mr. Martyn possesses, in addition to his engineering background, relevant experience in investigating commercial maritime accidents. Therefore, Mr. Martyn is qualified to render his opinions regarding the impact of the subject fleet management decisions.

B.     Reliability and Methodology

Borghese, ORS, and MRHS also contend Mr. Martyn's report lacks any scientific theories, calculations, or explanation in support of his conclusions.  Specifically, Borghese, ORS,

and MRHS maintain Mr. Martyn neither calculated any design load for the mooring system, which was purportedly "overwhelmed," nor did he define the components of the mooring system. They also argue that Mr. Martyn's proffers a "bare bones conclusion" that the fleet was "too wide" at the time of the breakaway. Borghese, ORS, and MRHS further maintain that Mr. Martyn "cherry-picked" facts and did not consider alternative causes of the breakaway. Finally, they argue that Mr. Martyn's opinions, as regard the "duck pond," are irrelevant.

In response, Alcosan contends that Mr. Martyn explained his methodology and provided proper support for his opinions based upon his practical experience. Further, Alcosan maintains that Mr. Martyn testified that he could not calculate the exact forces applied on the fleet of barges at issue after the fact because there are too many variables, particularly the size of the ice, which would lead to unreliable results. As regard "cherry picked" facts, Alcosan argues that such criticisms are best left to cross-examination, and as regard alternative causes, Alcosan explains that Mr. Martyn is not opining as to mooring equipment as those will be addressed by other experts.

When evaluating the reliability of a witness's methodology, a court is guided by several familiar factors drawn from *Daubert*:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*See In re Paoli*, 35 F.3d at 742 n.8. These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *See Kumho Tire*, 526 U.S. at 150. Accordingly, the Rule 702 inquiry is a

flexible one, and the court should also take into account any other relevant factors. *See Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003).

      Here, in this Court's assessment of Mr. Martyn's report and testimony, Borghese, ORS, and MRHS arguments relative to methodology and reliability are misplaced.  In the context of this case, Mr. Martyn's opinions do not require any particular theory or calculation.  In fact, Mr. Martyn has acknowledged that it would have been inappropriate to apply any calculation without factual evidence to support the necessary variables.  Instead, Mr. Martyn's opinions fit within a mosaic of expert testimony.  From the Court's perspective, Mr. Martyn is not opining on any ultimate issue or causation.  Instead, his expertise, based upon his relevant education and experience, aims to provide the trier of fact a generalized understanding of the fleet configuration at issue and the potential stresses it may have been under during adverse conditions.   Therefore, Mr. Martyn's opinions are not subject to exclusion based upon any critiques of methodology.  Further, Mr. Martyn's opinions are narrowly focused on fleet configuration and whether Movants followed ITS's procedures whereas other experts will address equipment failure.   And in regards to the "duck pond," Mr. Martyn has adequately explained the significance of the same and its impact on the stress and fleet break-up.  In sum, Mr. Martyn's report and testimony demonstrate a narrow scope that will provide the trier of fact assistance in understanding the general interplay of the barge configuration and the forces involved.

      Accordingly, ORS, and MRHS's Motion in Limine, to exclude opinions of David J. Martyn will be denied.

ORDER

Following consideration of Borghese, ORS, and MRHS's Motion (ECF No. 574), the respective briefs (ECF Nos. 583, 606, and 632), the arguments of counsel, and for the following reasons, Borghese, ORS, and MRHS's Motion is denied.

Dated: April 6, 2023

_____
Marilyn J. Horan
United States District Judge