**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **COMPLAINT OF:** | ) |
| **BORGHESE LANE, LLC** | ) |
| | ) |
| **For Exoneration or Limitation of** | )   **Civil No. 2:18-cv-00533-MJH (Lead Case)** |
| **Liability** | ) |
| | )   **Member and Related Cases: Civil Action Nos.** |
| | )   **18-510; 18-178; 18-317; 18-913; 18-902; and** |
| | )   **18-1647.** |

**RE:** **Industry Terminal & Salvage Company's** *Motion for Partial Summary Judgment on the Issue of Breach of Contract and Contractual Indemnity Against McKees Rocks Harbor Services*, *LLC* **(**ECF No. 536); and **Industry Terminal & Salvage Company's** *Motion to Strike McKees Rocks' Sur-Reply Brief* (ECF No. 618).

<u>Opinion</u>

Presently before the Court is Industry Terminal & Salvage Company's (ITS) Motion for Partial Summary Judgment on the Issue of Breach of Contract and Contractual Indemnity Against McKees Rocks Harbor Services, LLC (McKees Rocks or MHRS).  ECF No. 536.  The contract at issue is an August 2015 Harbor Services Agreement (HSA) entered into between ITS, McKees Rocks, and Borghese Lane, LLC (Borghese).  In brief, ITS asserts that McKees Rocks breached the parties' Harbor Services Agreement by refusing to perform its contractual obligations to indemnify and defend ITS and by failing to name ITS as an additional insured on McKees Rocks' policies.  McKees Rocks opposes the Motion, arguing that the August 2015 Harbor Services Agreement does not accurately reflect the intent of the parties and should be reformed.  McKees Rocks also argues that, regardless of reformation, the relevant indemnity and insurance obligations were never triggered.

Borghese, a party to the Harbor Services Agreement,[1] filed a Responsive Brief, arguing in favor of ITS's Motion.  ECF No. 593.  McKees Rocks filed Responses in Opposition to both ITS's Motion and Borghese's Response.  ECF No. 591 & 602.  ITS filed a Reply to McKees Rocks' Response.  ECF No. 600.  McKees Rocks then obtained leave to file and filed a Sur-Reply Brief to ITS's Reply Brief.  ECF No. 603, 604, & 613.  ITS seeks to strike the Sur-Reply Brief, arguing that it is improper and in violation of Court rules, because it does not address any new arguments from ITS's Reply Brief.  ECF Nos. 618 & 619.  McKees Rocks filed an Opposition Brief to ITS's Motion to Strike.  ECF No. 621.

For the reasons explained below, McKees Rocks' Sur-Reply will be stricken and ITS's Motion for Partial Summary Judgment will be granted.

## I.  Relevant Background

The Court has read ITS, McKees Rocks, and Borghese's respective Concise Statements of Material Fact (CSMF) and the Responses thereto.  *See* ECF Nos. 538 (ITS), 590 (McKees Rocks' Counterstatement), 592 (Borghese's Response to ITS CSMFs), 601 (ITS's Reply to McKee's Rocks Counterstatement).  While such pleadings cover a broad range of factual events relevant to the overall litigation in this action, presently, the Court is only concerned with genuine issues of material and related facts that affect the outcome of ITS's Motion for Partial Summary Judgment.  In its Motion, ITS seeks only to enforce the terms of the Harbor Services Agreement.  McKees Rocks opposes the Motion, relying, in part, upon the negotiations leading to the execution of the Harbor Services Agreement and upon the course of performance between Borghese and McKees Rocks.  The set of facts, necessary to resolve the present issues, are the relevant terms of the Harbor Services Agreement, the background leading up to execution of the

---

[1] Along with its co-party Ohio River Salvage, Inc. (ORS), who is not a party to the Harbor Services Agreement.

Harbor Services Agreement, and the conduct and knowledge of the parties in relation to their obligations under the Harbor Services Agreement.  Additional factual averments will be referred to in the discussion section as necessary.

### A.    The Harbor Services Agreement – Terms

ITS, Borghese, and McKees entered into the Harbor Services Agreement in August 2015. The Harbor Services Agreement contains terms regarding the provision of services with respect to the Jack's Run fleeting area, with an emphasis on the management and operation of the Jack's Run fleeting, or mooring, area.  ITS CSMF at ¶¶ 20-21; Harbor Services Agreement, Aug. 2015, ECF No. 536-11.  The pertinent terms of the Harbor Services Agreement are discussed herein. The recital clause states:

> WHEREAS, MRHS operates a river terminal ("McKees Rocks Terminal") located in McKees Rocks on or about mile marker 4 of the left descending ba[n]k of the Ohio River.  Borghese operates a towboat the M/V Jack Klee owned by MRHS with mooring and positioning barges delivered to and from McKees Rocks Terminal by local, regional and national towing companies. ITS leases a barge mooring area owned by the Allegheny County Sanitary Authority ("ALCOSAN") in the North Side at "Jacks Run" (the "Mooring Area") on or about mile marker 4 of the right descending bank of the Ohio River.
>
> It is the intention of the parties to the Agreement that MRHS manage the Mooring Area under the Terms and Condition[s] set forth below.

HSA, Recital Clause.  The Term of the Harbor Services Agreement was from August 1, 2015 to July 31, 2017, with a provision permitting McKees Rocks to extend the Harbor Services Agreement by providing 120-days written notice prior to its expiration.  *Id.* at ¶ 1.

Section 2 of the Harbor Services Agreement provides details of the services McKees Rocks was to provide for the Mooring Area:

> 2.    <u>Mooring Area</u>.  During the term of the Agreement, MHRS shall provide the following services for the Mooring Area:

(a)  ensure that the barges are properly moored at all times and the Mooring Area is maintained in a safe condition;

(b)  shift barges to and from McKees Rocks Terminal at the direction of MHRS or ITS;

(c)  transfer barges to and from 3rd party towing companies at the direction of ITS, and

(d)  email daily to ITS a daily fleet report identifying all barges moored at the Mooring area.

*Id.* at § 2.  Section 3 specifies the "shift rates" MHRS was to charge ITS "for services provided in Section 2."  *Id.* at § 3.  Section 4 specifies that "MHRS and ITS shall jointly market the mooring area" and "MHRS and ITS shall each be entitled to 50% of the daily fleeting income."  *Id.* at § 4.

The Indemnity provision of the Harbor Services Agreement states as follows:

8.    Indemnity.  MHRS shall indemnify, defend and hold harmless ITS and Borghese, including their respective owners, directors, officers, and employees from any and all claims and actions, including claims and actions for personal injury, death, property damage, environmental damage, economic loss, civil fines or penalties arising or relating to MHRS providing services for the Mooring Area. This indemnity, defense and hold harmless provision shall cover any and all  claims and actions asserting the negligence, recklessness, unseaworthiness or other similar conduct against ITS and Borghese, including their respective owners, directors, officers and employees. This indemnity, defense and hold harmless provision shall cover any and all claims and actions made by the employees of MHRS or employees of any of MHRS's contractors or subcontractors and if to the extent necessary to protect ITS and Borghese, including their respective owners, directors, officers, and employers, this constitutes a waiver of MHRS's worker's compensation immunity under state and federal laws including, but not limited to: The Pennsylvania Workers' Compensation Act, Jones Act, and Longshore and Harbor Worker's Compensation Act.

*Id.* at ¶ 8.  Section 9 of the Harbor Services Agreement states in part as follows:

9.    Insurance.

(a)    MHRS, at its own expense, shall at all times during the term of the Agreement maintain the following minimum insurance coverage:

Protection and indemnity insurance, or its equivalent, on forms acceptable to ITS and Borghese covering the following risks:

(i)  liabilities for loss of life and personal injury to passengers, agents, employees, contractors' employees, subcontractors' employees, stevedores, third parties and other persons;

(ii) liabilities arising as a result of allisions and collisions;

(iii) liabilities for damage cause otherwise than by collision to all other property;

(iv) liabilities for loss of life and personal injury to crew members, and

(v) liabilities for wreck removal.

Such protection and indemnity insurance shall be in an amount not less than $5,000,000 per occurrence with a deductible of not more than $10,000; and

Pollution insurance satisfactory to Owner against liabilities under the laws of Pennsylvania and the United States or, to the extent available, of any state or any rule or regulation arising as a result of any and all spillage or leakage of any fuel or other substance by the vessel or any other environmental damage.

All policies shall be endorsed as follows:

"It is hereby understood that INDUSTRY TERMINAL & SALVAGE COMPANY and BORGHESE LANE LLC and their respective owners, directors, officers, and employees are named as Additional Assureds hereunder with full waiver of subrogation, It is further understood that insurance carrier by MCKEES ROCKS HARBOR SERVICES, LLC be primary insurance with respect to the Harbor Services Agreement."

*Id.* at ¶ 9.  Section 10 of the Harbor Services Agreement states that the failure of McKees Rocks

"to maintain insurance as required by section 9" constitutes an "Event of Default."  *Id.* at ¶ 10.

The Harbor Services Agreement also contains the following integration clause:

14.    Entire Agreement.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof, and no representations, understandings, or amendments shall be binding unless in writing and signed by all parties.

*Id.* at ¶ 14.  Finally, the August 2015 Harbor Services Agreement was signed by the principals of parties to the Harbor Services Agreement: James Lind as President of McKees Rocks Harbor Services, LLC; Brian Mosesso, as President of Borghese Lane, LLC; and Bradley L. Busatto, as President of ITS.  ITS CSMF ¶ 52-53.

### B.    The Harbor Services Agreement – Background

Several drafts of the Harbor Services Agreement were circulated among the parties by email prior to execution.  ITS CSMF at ¶ 23.  The initial draft of the Harbor Services Agreement was prepared by one of ITS's owners, Max Busatto, Esquire.  *Id.*  ¶¶ 9, 25, 26.  The initial draft of the Harbor Services Agreement specified in Section 2 that "*Borghese* shall provide … services for the mooring area."  *Id.* at ¶ 26; Initial Draft Agreement, ECF No. 536-12 (emphasis added).

The initial draft stated that Borghese and ITS were to "jointly market the mooring area to maintain existing and attract new business."   ITS CSMF at ¶ 27; Initial Draft Agreement, ECF No. 536-12.  The "daily fleeting income," as provided in the initial draft, would have been split equally between Borghese and ITS, and Borghese would have been responsible to bill ITS for the barge shifting Borghese performed under Section 2.  *Id.*  Under the initial draft agreement, McKees Rocks would not have received any income.  The president of McKees Rocks, Jim Lind, recognized this fact after the draft was circulated among the parties when he said to Bradley Busatto, the president of ITS, that McKees Rocks would not be "making any money from this agreement."  ITS CSMF at ¶¶ 8, 11-13, & 28.

The identity of the party to be responsible for the Mooring Area at Jack's Run under Section 2, and for indemnity and insurance obligations under Sections 8 and 9, changed in subsequent drafts of the Harbor Services Agreement.  *Id.* at ¶¶ 23-24; *see Id.* at ¶ 29 (ECF No. 536-13 (referring to "Borghese(MHRS)" as a single unit), ECF No. 536-14 (specifying that

mooring area management tasks are assigned to both "MRHS and Borghese"), & ECF No. 536-15 (same)).  Two drafts also assigned indemnity and insurance tasks to both "MRHS and Borghese."  ECF Nos. 536-14 & 536-15.  Other drafts also indicated that all three parties, ITS, Borghese, and McKees Rocks, would split the daily fleeting income.  ECF Nos. 536-13, 536-14 & 536-15.

Ultimately, mooring area management, indemnity, and insurance obligations were assigned to only McKees Rocks in the final and only fully executed Harbor Services Agreement.  The final Harbor Services Agreement also provided that "MHRS and ITS shall jointly market the mooring area" and that "MHRS and ITS shall each be entitled to 50% of the daily fleeting income."  As indicated above, Section 3 of the final Harbor Services Agreement provides that McKees Rock shall charge ITS for the services performed under Section 2.

McKees Rocks and ITS present differing versions of how the parties decided that McKees Rocks, and not Borghese, would have responsibility to manage and operate the Jack's Run Mooring Area in the final draft.  ITS maintains that it was up to McKees Rocks and Borghese to make the decision.  *Id.* at ¶ 30.  McKees Rocks maintains that it was solely ITS's Max Busatto who decided to put McKees Rocks as the responsible party.  McKees Rocks' Resp. CSMF, ECF 590 at ¶¶ 30, 36-38.  Similarly, the parties dispute the level of participation by the respective company principals in negotiating the terms of the Harbor Services Agreement.  *See* McKees Rocks' Resp. CSMF, at ¶ 31.  The level of participation by the principals in negotiations and the decision as to which party decided to place McKees Rock as the responsible party under Section 2 are (absent allegations of fraud or ambiguity) irrelevant to the terms of the final contract.  No party disputes that the Harbor Services Agreement is a valid contract.

### C.    The Harbor Services Agreement –Relevant Conduct

Prior to the effective date of the Harbor Services Agreement, McKees Rocks and Borghese had entered into two separate Vessel Piloting Agreements, both dated March 29, 2016. ITS CSMF at ¶ 59.  Pursuant to each Vessel Piloting Agreement, Borghese piloted McKees Rocks' tugboats, the Charlotte Klee and the Jack Klee, in part, performing the management and operation duties with respect to Jack's Fleet mooring area and McKees Rocks' terminal.  *Id.*  The Vessel Piloting Agreements between McKees Rocks and Borghese were in effect at the time of the barge breakaway.  *Id*. ¶ 60.

Pursuant to Section 2 of the executed Harbor Services Agreement, McKees Rocks was obligated to "ensure that the barges are properly moored at all times and the Mooring Area is maintained in a safe condition" as well as "shift barges to and from McKees Rocks Terminal at the direction of [McKees Rocks] or ITS."  HSA, § 2(a) & (b).  McKees Rocks contracted with Borghese to provide such services by way of the Vessel Piloting Agreements.  ITS CSMF at ¶ 58.

Mr. Lind testified that McKees Rocks does not have any personnel who could take action to make sure that the barges in Jack's Run fleeting area were moored properly, nor does McKees Rocks have control of a boat to accomplish the same.  Dep. J. Lind, at 173.  Mr. Lind testified that McKees Rocks hired Borghese to make sure that the barges were being moored properly and were adequately secured at the Jack's Run fleeting area.  Dep. J. Lind, at 173-74.  The duties listed in Section 2 of the Harbor Services Agreement were being performed by Borghese pursuant to the Vessel Piloting Agreement.  ITS CSMF at ¶ 64.  "Borghese did not receive revenue directly from the Harbor Services Agreement; Borghese received revenue as a result of operating the tugboats required to provide the services pursuant to the Vessel Piloting Agreement

8

which fulfilled the obligations of McKees Rocks to provide the services identified in the Harbor

Services Agreement." ITS CSMF at ¶ 63; McKees Rocks Resp. CSMF at ¶ 63 (McKees Rocks

states that ITS's statement of fact No. 63 is "Not disputed").

In accord with the Harbor Services Agreement, McKees Rocks invoiced ITS monthly for

McKees Rocks' services under the Harbor Services Agreement. ITS CSMF at ¶ 68. McKees

Rocks billed ITS based upon the information Borghese provided to McKees Rocks about

Borghese's movement and mooring of vessels at Jack's Run. *Id.* at ¶ 69. Specifically, Borghese

tracked every barge that was in the Jack's Run mooring area for a particular month and reported

such information to McKees Rocks, whereupon McKees Rocks used that information to invoice

ITS. *Id.* at ¶ 70.

Pursuant to Section 4 of the Harbor Services Agreement, McKees Rocks and ITS "shall

each be entitled to 50% of the daily fleeting income for all barges moored at the Mooring Area

regardless of which party generated the work." HSA, § 4. Thus, McKees Rocks would invoice

ITS, and ITS would invoice the barge customers themselves to generate the revenue that ITS and

McKees Rocks equally shared. *Id.* at ¶ 72. In contrast, Borghese did not receive any direct

income from the Harbor Services Agreement. *Id.* at ¶ 73. Instead, Borghese received income

pursuant to the Vessel Piloting Agreements between Borghese and McKees Rocks. *Id.* at ¶ 74.

### D.      Crossclaims and Counterclaims of ITS and McKees Rocks

In these consolidated actions, both ITS and McKees Rocks have asserted claims relevant

to the instant Motion. The crossclaims of both parties, and counterclaims of McKees Rocks,

align with the arguments presented here: ITS claims that McKees Rocks breached the Harbor

Services Agreement and requests enforcement of the contract, while McKees Rocks claims that

the Harbor Services Agreement should be reformed. Presently, ITS seeks partial summary

judgment on its crossclaims against McKees Rocks, as well as judgment against McKees Rocks' counterclaims and similar crossclaims against ITS based upon reformation and equitable reformation of the Harbor Services Agreement.

In its crossclaim against McKees Rocks, ITS alleges that McKees Rocks was required to manage the Jacks Run Fleet facility pursuant to the Harbor Services Agreement, in part, by "ensur[ing] that the barges are properly moored at all times and the Mooring Area is maintained in a safe condition."[2]  ITS also alleges that it tendered all claims asserted against it to McKees Rocks for defense, under Section 8 of the Harbor Services Agreement; and, McKees Rocks refused to defend.  ITS claims that McKees Rocks' refusal was a breach of the Harbor Services Agreement.  ITS  demands judgment against McKees Rocks for "all costs, including defense costs and reasonable attorney's fees incurred as a result of MRHS breach of its obligation to defend and all expenses incurred and discharged and all expenses incurred in discharging the claims asserted against ITS in the current litigation."

In its crossclaim asserted against both McKees Rocks and Borghese, ITS seeks indemnity and/or contribution from either or both, to the full extent that ITS is found liable in this matter. ITS's crossclaim is based on its allegation that any damages suffered by any plaintiff "were the direct and proximate result of the negligence, unseaworthiness, breach of oral maritime contract and/or breach of the warranty of workmanlike performance on the part of MRHS and/or Borghese and that they are jointly and severally liable or liable over to ITS for indemnity and/or contribution to the full extent of plaintiffs' damages."

---

[2]  Because this is a consolidated action, with multiple parties filing separate pleadings at different times, both ITS and McKees Rocks have filed their respective crossclaims, counterclaims, and answers in multiple pleadings.  The content of the crossclaims and counterclaims at issue herein are consistent across the parties' pleadings.

In its Answer to ITS's crossclaim, McKees Rocks asserts a counterclaim for reformation of the Harbor Services Agreement, a counterclaim for equitable reformation, and a counterclaim for contribution and/or indemnity.  McKees Rocks also asserts four crossclaims.  In its first crossclaim, asserted against both ITS and Borghese, McKees Rocks seeks reformation of the Harbor Services Agreement by mutual mistake.  McKees Rocks asserts that the mutual mistake resulted in McKees Rocks being named as the responsible party for the mooring area under Section 2, McKees Rocks being named as the responsible party for Indemnity obligations under Section 8, and McKees Rocks being named as the responsible party for Insurance obligations under Section 9.  McKees Rocks claims that Borghese should have been named as the responsible party under all three sections.  McKees Rocks refers to the mistake as a "scrivener error."  In its second crossclaim against both ITS and Borghese, McKees Rocks seeks "Equitable Reformation" of the alleged mistakes appearing in the Harbor Services Agreement.  McKees Rocks also asserts a crossclaim against Borghese for contractual indemnification.  Finally, McKees Rocks asserts a crossclaim, seeking contribution and/or indemnification from ITS and Borghese, citing ITS's and Borghese's negligence and/or carelessness.

## II.    Standard of Review

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted.  Fed. R. Civ. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts

in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

The court's function is not to weigh the evidence, make credibility determinations or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000). The mere existence of a factual dispute will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).

Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof or that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 322, 325; *Marten v. Godwin,* 499 F.3d 290, 295 (3d Cir. 2007). If the movant meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Fed. R. Civ. P. 56(e); *see Liberty Lobby,* 477 U.S. at 247-48; *Celotex,* 477 U.S. at 323–25. The nonmoving party must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S.

at 324.  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment.  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

### III.    Discussion

First, the Court concludes, consistent with the parties' position, that the Harbor Services Agreement is a valid contract.  Next, the Court addresses McKees Rocks' reformation argument, followed by discussion of McKees Rocks' arguments that it is not obligated to perform under either the Indemnity or Insurance provisions.  Before addressing ITS's Motion for Summary Judgment, however, the Court addresses ITS's Motion to Strike McKees Rocks' Sur-Reply.

### A.    Motion to Strike Sur-Reply Brief

On November 16, 2022, McKees Rocks requested leave of Court to file a Sur-Reply Brief.  ECF No. 603.  The Court granted the Motion that same day, permitting McKees Rocks to file a Sur-Reply Brief limited to responding to new issues raised by ITS in its Reply Brief.  ECF No. 604.  McKees Rocks next filed its Sur-Reply Brief.  ECF No. 613  Thereafter, ITS filed a Motion and Brief to Strike McKees Rocks' Sur-Reply Brief.  ECF Nos. 618 (Motion) and 619 (Brief).  McKees Rocks filed an opposition in Response to the Motion to Strike.  ECF No. 621. The Court indicated by Order that it would resolve the Motion to Strike at the time it resolved the Motion for Partial Summary Judgment.  ECF No. 620.

In consideration of McKees Rocks' Sur-Reply Brief, ITS's Motion and Brief to Strike, McKees Rocks' Response to the Motion to Strike, and the Court's Order granting McKees Rocks' Motion to file a Sur-Reply Brief, the Court concludes that ITS's arguments are well-taken.  ITS's Reply Brief complied with the Court's Standing Order and Procedures on Civil Motion Practice, which states that "Reply briefs are most helpful when they identify and respond to the novel matters contained in the opposition brief that merit a reply."  ITS did not raise new issues in its Reply Brief.  McKees Rocks' Sur-Reply, in contrast, does not respond to any new ITS Reply arguments, because there were none.  McKees Rocks' Sur-Reply was used as a vehicle to reassert and reargue McKees Rocks' original arguments presented in Response to ITS's initial Brief.  Additionally, McKees Rocks' Sur-Reply only addresses aspects from ITS's original Brief that McKees Rocks could have raised in its Response and Brief, but did not.  While McKees Rocks' Sur-Reply arguments, if considered, would not affect the outcome of ITS's Motion for Partial Summary Judgment, the Court finds that striking the Sur-Reply is appropriate.  Accordingly, the Court Orders that McKees Rocks' Sur-Reply Brief, filed at ECF No. 613, is stricken, and it will not be considered by the Court in resolving ITS's Summary Judgment Motion.

## B.    The August 2015 Harbor Services Agreement

There is no factual or legal dispute that the August 2015 Harbor Services Agreement is a valid and enforceable contract.  Indeed, McKees Rocks' reformation argument "presupposes that a valid contract between the parties was created."  *H. Prang Trucking Co. v. Local Union No. 469*, 613 F.2d 1235, 1239 (3d Cir.1980).  Each party acknowledges that the Harbor Services Agreement was signed by a principal of each company.  The parties operated under the terms of the Harbor Services Agreement since its inception, and all parties agree that, after the original

written Harbor Services Agreement expired, they continued to so operate under an oral Harbor Services Agreement under the same terms and conditions.  The Court concludes that the written Harbor Services Agreement is a valid and enforceable maritime contract and that the parties' oral continuing Harbor Services Agreement is an enforceable oral maritime contract.

There is also no dispute that the Harbor Services Agreement specifies that McKees Rocks is the designated responsible party under Sections 2, 8, and 9.  There is no ambiguity whatsoever. The Court concludes that, under the plain terms of the Harbor Services Agreement, McKees Rocks bears the operational and management responsibilities for the Jack's Run fleeting and Mooring Area, to include ensuring proper barge mooring and maintenance of the mooring area in a safe condition.  In addition, McKees Rocks is the responsible party under the indemnification and insurance provisions of the Harbor Services Agreement.  Therefore, unless McKees Rocks is able to demonstrate that the Harbor Services Agreement must be reformed, or that Sections 8 and 9 do not trigger McKees Rocks' obligations, Partial Summary Judgment in ITS's favor is appropriate.

### C.     Reformation of the Harbor Services Agreement

Reformation is a remedy that is "sparingly granted."  *Palek v. State Farm Fire & Cas. Co.*, 535 F. Supp. 3d 382, 387 (W.D. Pa. 2021) (quoting *Twin City Fire Ins. Co. v. Pittsburgh Corning Corp.*, 813 F.Supp. 1147, 1149 (W.D. Pa. 1992)).  "Reformation of a written instrument is available when the instrument is 'at variance with the terms of the parties' original agreement' in order to give effect to 'the true agreement of the parties.'"  *Palek*, 535 F. Supp. 3d at 387-88 (quoting 388 Corbin on Pennsylvania Contracts § 28.11 (2020)).  "Under Pennsylvania law, the evidence standard in reformation cases is high and the party asserting it is required to show the existence of the mutual mistake by 'clear [and precise] and convincing' evidence."  *Bank of New*

*York v. Bates*, No. CIV.A. 3:13-0690, 2015 WL 1443282, at *9 (M.D. Pa. Mar. 30, 2015)

(quoting *Holmes v. Lankenau Hosp.*, 627 A.2d 763, 767–68 (Pa. Super. Ct. 1993)).  The party

seeking reformation must produce clear and convincing evidence that demonstrates that the

contract does not reflect the parties' actual intention.  *Bugen v. New York Life Ins. Co.*, 184 A.2d

499, 500–01 (Pa. 1962).  A "mutual mistake only exists if  [all] parties to a contract [are]

mistaken as to existing facts at the time of execution." *Amerisourcebergen Drug Corp. v. Kohll's*

*Pharmacy & Homecare, Inc.*, No. CIV.A. 09-1166, 2012 WL 5287887, at *2 (E.D. Pa. Oct. 26,

2012) (quotations and citations omitted).  Although the Harbor Services Agreement is an

integrated contract with an integration clause[3], "[a]s a general rule, parol evidence may [] be

introduced to demonstrate the existence of mutual mistake."  *In re Leach*, No. CIV.A 10-449,

2010 WL 3038794, at *4 (W.D. Pa. July 30, 2010) (citing *Bugen*, 184 A.2d at 501).

The following statements of fact, relative to McKees Rocks' reformation argument, are

undisputed. Section 2 of the Harbor Services Agreement designates McKees Rocks as the party

responsible for the Jack's Run fleeting area.  Borghese performed the fleeting and mooring

services at Jack's Run both before and after execution of the Harbor Services Agreement.  All

three parties were aware that Borghese was performing Jack's Run fleeting and mooring services

consistent with Section 2 of the Harbor Services Agreement.   McKees Rocks relies, in part, on

said undisputed facts to argue that the contract must be reformed.  McKees Rocks' argument is

not complicated and, in its own words, McKees Rocks succinctly explains as follows:

> [T]he executed HSA . . . incorrectly states that operational responsibilities rested
> with McKee, and not Borghese (as confirmed by the [] testimony of Jim Lind and

---

[3]  The Harbor Services Agreement contains an integration clause in Section 14:

> 14. <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties
> pertaining to the subject matter hereof, and no representations, understandings, or amendments
> shall be binding unless in writing and signed by all parties.

Brian Mosesso).  However, from the inception of the business relationship
discussed in the HSA (August 1, 2015), through the end of the term of the written
contract (July 31, 2017), and up to and through the date of the incident on January
13, 2018, it was Borghese, not MHRS, that actually performed the
aforementioned operational obligations in the HSA.  Further, despite the lack of a
written agreement following the expiration of the HSA (i.e., after July 31, 2017)
and through the date of the incident on January 13, 2018), ITS, Borghese, and
MRHS all understood, and acted in accordance with their understanding, that the
responsibility to ensure that **all barges** . . . were properly moored and the mooring
area and the barges were maintained in a safe condition rested with Borghese.

McKees Rocks' Br. Resp. 12-13 (bold and underline in original).  McKees Rocks further argues

that the fact that "MRHS" is named as the responsible party under Section 2, when Borghese

performed the relevant duties, is a mutual mistake "shared and relied on by [all] parties to [the]

contract."  *Regions Mortg., Inc. v. Muthler*, 585 Pa. 464, 889 A.2d 39, 41 (2005).

McKees Rocks argues that the existence of the mutual mistake is itself evidence of a

latent ambiguity, in light of the parties' actual course of performance.  McKees Rocks also

argues that the term "ensure," as it appears in the following phrase in Section 2, is patently

ambiguous: "(a)  ensure that the barges are properly moored at all times and the Mooring Area is

maintained in a safe condition."  HSA, § 2(a).  McKees Rocks' argument as to this issue shows

only that the term "ensure" is abundantly clear under the circumstances.  In McKees Rocks'

argument, it  defines ensure as, "to take reasonable action to accomplish something."  McKees

Rocks Br. Opp. 16.  McKees Rocks then explains, consistent with all three parties'

understanding, that "MHRS took the reasonable action of retaining Borghese to "ensure that the

barges [were] properly moored at all times and the mooring area [was] maintained in a safe

condition."  *Id.* Thus, the Court disagrees that the term "ensure" in Section 2 is ambiguous.

McKees Rocks asks that the Court reform the Harbor Services Agreement by inserting

Borghese, and removing McKees Rocks, as the party with operational responsibilities with

respect to the Mooring Area under Section 2.  McKees Rocks argues that the reformation is

17

warranted because it would accurately reflect the course of performance of the parties; namely, that Borghese was the party who had been managing and maintaining the Mooring Area before and during the term of the Harbor Services Agreement.

McKees Rocks' reformation argument fails because its premise, that the parties' course of performance is contrary to the terms of the Harbor Services Agreement, does not accurately reflect the evidence. The evidence shows that McKees Rocks retained Borghese to perform the operational obligations of the Mooring Area, while Borghese, in turn, was paid by McKees Rocks for performing such services. Thus, the parties' expectation, that McKees Rocks was to manage the Mooring Area, is consistent with McKees Rocks contracting with Borghese to perform certain functions provided for under the Harbor Services Agreement. McKees Rocks' contract with Borghese demonstrates that McKees Rocks knew of and acted in response to its obligations under the Harbor Services Agreement. As ITS stated in its Reply Brief, and which is consistent with the evidentiary record, McKees Rocks "always intended to perform [the] required services of ensuring the barges were safely moored and maintaining the fleet in a safe condition by retaining and paying Borghese; there was no inconsistency between the contract terms and the course of the parties' conduct." ITS Reply, 11 (ECF No. 600). ITS's argument is supported by McKees Rock's president, Jim Lind's testimony, wherein he testified that (1) McKees Rocks did not have personnel capable of ensuring that the barges in Jack's Run are properly moored; and (2) that McKees Rocks' personnel did not do anything to make sure that the barges at Jack's Run were being properly moored and adequately secured; and (3) that McKees Rocks hired Borghese to make sure that the barges at Jack's Run were being properly moored and adequately secured. Dep. J. Lind at 173-74.

Next, there is no agreed upon *mutual* mistake among the parties.  To warrant reformation based upon mutual mistake, the party alleging a mistake must demonstrate that all parties were mistaken as to existing facts at time of execution of the agreement.  *Bates*, 2015 WL 1443282, at *8.  McKees Rocks argues that Borghese should have been named in Section 2, and that it was a mistake that McKees Rocks was named in Section 2.  However, ITS and Borghese do not agree with McKees Rocks that there is a mistake in the executed Harbor Services Agreement.  *Optopics Lab'ys Corp. v. Nicholas*, No. CIV. A. 96-8169, 1997 WL 602750, at *11 (E.D. Pa. Sept. 23, 1997) (where parties do not agree that there is a mistake in the agreement, there is no mutual mistake).  Thus, because there is no agreement that the parties operated under a *mutual* mistake, there is no basis to support reforming the Harbor Services Agreement.

Finally, considering the parties' prior negotiations, the circulation of draft Agreements, and the prior and contemporaneous course of performance, the Court further concludes that there is no justification for reforming the Harbor Services Agreement.  The August 2015 Harbor Services Agreement involved an arms-length negotiation among sophisticated parties, all of whom had the benefit of the advice of counsel.  The parties took their time in drafting and circulating revisions of the Harbor Services Agreement.  The President for each party signed the Harbor Services Agreement.  In addition to the express Harbor Services Agreement provisions discussed above, the "Recitals" section of the Harbor Services Agreement unambiguously states: "It is the intention of the parties to the Agreement that MHRS manage the Mooring Area under the Terms and Conditions set forth below."  Furthermore, the parties specifically and prominently designated *McKees Rocks* as the responsible party for overseeing the operation, management, and maintenance of the Mooring Area in Section 2.  McKees Rocks (and not Borghese) received the consideration for its assumption of its responsibilities under the Harbor

Services Agreement.  The evidence supports that the parties understood McKees Rocks'

responsibilities under the Harbor Services Agreement and the intent that McKees Rocks would

carry out such responsibilities.  Such is also evident by virtue of the McKees Rocks/Borghese

Vessel Piloting Agreements, whereby McKees Rocks contracted with and paid Borghese to

perform the operational responsibilities related to the Mooring Area.  There is no doubt that the

terms of the Harbor Services Agreement are the exact terms the parties negotiated and approved.

McKees Rocks' claim, that the Harbor Services Agreement should be reformed, fails.

Accordingly, the Harbor Services Agreement will be enforced as written.

### D.     Indemnity and Insurance Provisions

McKees Rocks also argues that it cannot be liable under either the Indemnity Section or

the Insurance Section.

### 1.     Indemnity

In relevant part, the Indemnity provision of the Harbor Services Agreement provides that

McKees Rocks "shall indemnify, defend and hold harmless ITS and Borghese" for all claims and

actions "arising or relating to MHRS providing services for the Mooring Area."  HSA, ¶ 8.

McKees Rocks argues that, because it retained *Borghese* to "provid[e] services for the Mooring

Area," no claims or actions related to the January 13, 2018 barge breakaway arose or were

related to *McKees Rocks* providing services for the Mooring Area.  Therefore, McKees Rocks

argues its  indemnity obligations were not triggered.

As already discussed, McKees Rocks contracted with Borghese to provide services for

the Mooring Area in response to McKees Rocks' contractual responsibilities under Section 2 of

the Harbor Services Agreement.  McKees Rocks' Vessel Piloting Agreements with Borghese to

perform such services for McKees Rocks is consistent with the Harbor Services Agreement.  The

evidence submitted by all parties demonstrates that all parties knew that McKees Rocks was responsible to fulfill its obligations under the Harbor Services Agreement, which was then accomplished through McKees Rocks' Vessel Piloting Agreements with Borghese. McKees Rocks assumed the Indemnity obligations when it signed the Harbor Services Agreement. McKees Rocks did not avoid its contractual indemnification duties by contracting with Borghese to perform its Section 2 services and duties. The Court finds that McKees Rocks' obligation to indemnify under Section 8 has been triggered. Specifically, the fleeting of the barges in the Jack's Run fleeting and mooring area on January 13, 2018 related to the Harbor Services Agreement, Section 2 Mooring Services and/or mooring area condition. Therefore, McKees Rocks must defend ITS as provided under Section 8 of the Harbor Services Agreement. The Court further finds that McKees Rocks has breached the Harbor Services Agreement by failing to perform its duty to defend under Section 8. Further, to the extent ITS is found liable for damages caused by the Mooring Services and/or mooring area condition at the Jack's Run fleeting and mooring area on January 13, 2018, McKees Rocks must indemnify ITS as provided for in Section 8 of the Harbor Services Agreement.

### a.   The Holcim Claim

McKees Rocks separately raises a specific argument that its indemnification obligations do not apply to "contractual indemnity" claims tendered by ITS that were not disclosed in the Harbor Services Agreement. The specific claim at issue concerns a company named Holcim, which had claimed a loss for cargo shipped by Ingram. There is no dispute that Holcim's cargo loss claim arose from the January 13, 2018 barge breakaway. ITS settled Holcim's claim by paying Holcim directly for its loss, and in turn, ITS received an assignment of Holcim's rights and claims against third parties. Receipt and Release, Sept. 2018, at ¶ 2 (ECF No. 590-20, at 2).

Holcim's assignment of its rights to ITS included any claims Holcim may have had against Borghese and McKees Rocks. *Id.* ITS tendered to McKees Rocks a claim for indemnification as to ITS's payment of Holcim's claim.

According to McKees Rocks, a contractual indemnity claim is not the responsibility of McKees Rocks, because such third-party contractual liabilities were not clearly and unambiguously disclosed in the Harbor Services Agreement. Holcim suffered damages that arose out of the January 13, 2018 barge breakaway, thereby permitting ITS to seek indemnification for any Holcim claim for damages presented to ITS. When Holcim asserted its claim for damages to ITS, ITS could have immediately tendered Holcim's claim for damages to McKees Rocks under Section 8. Instead, ITS chose to seek a negotiated settlement of Holcim's claim for damages. ITS's decision is a reasonable business decision. Accordingly, pursuant to Section 8, McKees Rocks must provide indemnity to ITS for the Holcim claim, to the extent ITS is found liable for damages caused by the Mooring Services and/or mooring area condition at the Jack's Run fleeting and mooring area on January 13, 2018.

## 2. Insurance

McKees Rocks argues that it did not breach its Section 9 obligation to name ITS as an additional insured on McKees Rocks' protection and indemnity insurance. McKees Rocks states that it can only obtain protection and indemnity insurance on boats it actually owns. In this instance the relevant boats are the Jack Klee and Charlotte Klee. Because neither of these boats were actively working on the date of the barge breakaway, McKees Rocks argues that its insurance obligations were not triggered. However, as ITS points out, Section 9 requires McKees Rocks to name ITS as an additional insured on "protection and indemnity" insurance or name ITS as an additional insured on "*equivalent insurance*." McKees Rocks focuses only on its

obligation to add ITS as an additional insured to protection and indemnity insurance and ignores the requirement to add ITS as a named insured on "equivalent insurance."  ITS identified available equivalent insurance McKees Rocks owned at the time.[4]  McKees Rocks also ignores the majority of Section 9's obligations, which set out more specifically what is required of McKees Rocks, and what is covered, under Section 9.  McKees Rocks' argument is inconsistent with the plain language of Section 9.  The Court finds that McKees Rocks has breached the Harbor Services Agreement under Section 9 by failing to name ITS as an additional insured on McKees Rocks' protection and indemnity insurance policies or equivalent insurance.

### IV.    Conclusion

As stated above, the Court finds that McKees Rocks' Sur-Reply Brief does not concern any new arguments raised by ITS in its Reply Brief.  Accordingly, ITS's Motion to Strike McKees Rocks' Sur-Reply Brief, ECF No. 618, will be granted.

With respect to the ITS's Motion for Partial Summary Judgment, the Court finds that the August 2015 Harbor Services Agreement is a valid, unambiguous, and enforceable maritime contract.  Further, after the expiration of the written Harbor Services Agreement, the parties continued said contractual relationship through their oral Harbor Services Agreement.  The Court further finds that McKees Rocks has failed to produce clear, precise, and convincing evidence demonstrating any sufficient bases to reform said contract. There is no question of material fact to establish a mutual mistake, latent ambiguity, or any course of performance to support a reformation.  With respect to McKees Rocks' obligations under the Indemnity and Insurance

---

[4] McKees Rocks' unconvincingly argues that the "equivalent policies" are not applicable because it is "McKees Industrial Enterprises, Inc." who owns such policies.  McKees Industrial Enterprises, Inc. is the sole member of McKees Rocks Harbor Services, LLC.  McKees Rocks Harbor Services, LLC is the named insured on the policy, and it was a policy in McKees Rocks' possession that McKees Rocks had the power and authority to add ITS as an additional insured.

provisions of the Harbor Services Agreement, the Court finds that said provisions are enforceable against McKees Rocks.  Additionally, the Court finds that McKees Rocks breached its obligations under the Harbor Services Agreement in its refusal to defend ITS under Section 8 and in failing to name ITS as an additional insured under Section 9.

Accordingly, ITS' Motion for Partial Summary Judgment will be granted.

An appropriate Order will be entered.

_____
Marilyn J. Horan
United States District Judge

Dated: April 24, 2023